## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**K & H DEVELOPMENT GROUP, INC,
a Florida Corporation, and BLA-LOCK
DESTIN DEVELOPMENT, INC.,**
           **Plaintiffs,**

**vs.**                                                     **Case No.   3:06cv494/MD**

**KEITH HOWARD; THE HOWARD
COMPANY OF THE SOUTHEAST, INC.,
a Florida Corporation; INTRAWEST
SANDESTIN COMPANY, L.L.C., a
Foreign Corporation; INTRAWEST
RESORTS, a Foreign Corporation;
SANDESTIN OWNERS ASSOCIATION, INC.,
a Florida Non-Profit Corporation; and
WALTON COUNTY, FLORIDA, a
subdivision of the State of Florida,**
           **Defendants.**

_____

## MEMORANDUM OPINION ON INTRAWEST SANDESTIN'S AMENDED MOTION FOR SUMMARY JUDGMENT

      Before the court are the amended motion for summary judgment filed by defendant Intrawest Sandestin Company L.L.C (doc. 382) and supporting memorandum of law and statement of facts (doc. 383, 384) along with plaintiff's response in opposition to the motion (doc. 405), and statement of material facts (doc. 404).  The undersigned has jurisdiction by referral after the parties consented to the exercise of jurisdiction by the undersigned magistrate judge.

### Case history and procedural background

      Plaintiff K&H Development Group, Inc., a Florida corporation ("K&H") filed its original Verified Complaint (Doc. 1) against Keith Howard and The Howard Company

of the Southeast, Inc. (collectively, the "Howard Defendants"); Intrawest Sandestin Company, L.L.C., a foreign corporation ("Intrawest")and Intrawest Resorts, a foreign corporation;[1] Sandestin Owners Association, Inc., a Florida Non-Profit Corporation ("Sandestin" or "SOA"); and Walton County, Florida, a subdivision of the State of Florida, ("Walton County" or the "County").  Plaintiff alleged generally that, through the collective and individual efforts of the defendants, it had been prevented from developing property it owned on the north side of U.S. Highway 98 within the Sandestin Development of Regional Impact (hereafter, "DRI").[2]   After initial responses to that Complaint were filed, K&H sought, and was granted, leave to file a Verified Amended Complaint (Doc. 48, 49, 58).

According to the verified amended complaint (henceforth "complaint"),[3] K&H obtained a 1.453 acre piece of property by quitclaim deed from a company called Centaworld Holding Corporation on May 9, 2000.  The K&H property is located within Parcels 208/308 as designated in the Sandestin DRI, which governs development within the Sandestin Resort. A DRI is defined by statute as "any development which, because of its character, magnitude or location, would have a substantial effect upon the health, safety, or welfare of citizens of more than one county." § 380.06(1), Fla. Stat. 2008.  The Master Plan of defendant Walton County, where the property is located, was approved by the County for commercial development.  K&H alleges in the complaint that at the time it acquired the property, it owned a proportionate share of commercial development rights.  Commercial development rights are generally measured in square feet of allowable development and referred to as

---

[1]Intrawest Resorts was terminated as a party on August 27, 2007 by agreement of the parties. (Doc. 180).

[2]A development of regional impact is "any development which, because of its character, magnitude, or location, would have substantial effect upon the health, safety, or welfare of citizens of more than one county." § 380.06(1) Fla. Stat. (2008).

[3]The allegations are summarized as they appear in the complaint, although evidence submitted in support of the motions for summary judgment indicates at least some minor variations from these facts.

"intensity," while residential development is usually measured in units and referred to as "density."[4]  Plaintiff asserts that there was no reservation or transfer of the allocated density or intensity affecting its property either in the May 9, 2000 transaction by quitclaim deed or in any previous transfer of title.  (Doc. 49, Complaint, ¶¶ 15-20)

Defendant Howard has attempted to purchase plaintiff's property to pursue development.  Howard also purchased a purported option to purchase land, including the K&H property, and filed suit for specific performance in Walton County when it was unable to acquire the K&H property.  (*Id.,* ¶ 22).

Walton County Ordinance 2000-03, was approved on February 8, 2000 and modified the prior allocation of development rights.  The commercial development allocation to the entire 208/308 parcels was 398,000 square feet of commercial and 40,000 square feet of office development.  According to K&H, its proportionate share of the commercial development allocation was 14, 421 square feet of commercial and 1,207 square feet of office development.  It asserts that it has never sold or otherwise transferred development rights on ths property, and the development of this property has not been affected by subsequent ordinances. (*Id.,* ¶¶ 23-26).

In 2001, K&H was considering selling the property and retained a firm to design a sign that would comply with Sandestin Architectural Design Guidelines. It attempted to place a compliant sign bearing a contact person's name and phone number on the property, but was not permitted to do so, although the Howard Defendants were allowed to place a similar sign on their property.  After K&H was told that its sign met the architectural guidelines, the guidelines were intentionally changed so K&H's sign would no longer be acceptable.  This was allegedly due to an agreement between the defendants to prevent K&H from selling or developing its property to anyone other than the Howard defendants.  (*Id.,* ¶¶ 27-32).

---

[4] The words "density" and "intensity" are often mistakenly interchanged. (¶ 19 n.1).

On May 6, 2002 K&H notified Sandestin of its intent to proceed with development of the property.  On August 6, 2002, Intrawest submitted a Notice of Proposed Change ("NOPC") for the Sandestin Development of Regional Impact ("DRI") which was drafted by and for the joint benefit of the defendants.  The purpose of the NOPC was to create a mixed use commercial development on Parcels 208/308, and it suggested transferring densities to Parcels 208/308 and transferring densities and intensities within Parcels 208/308, increasing the intensity and density on the Howard-owned portion of Parcels 208/308.  Keith Howard and others represented that the NOPC would not impact non Howard Group property owners (*Id.,* ¶¶ 33-43).

On November 4, 2002, the Walton County Board of County Commissioners considered the NOPC at a Land Use Hearing.  Attorney Ken Goldberg, representing K&H, told the Board that there was conflicting information about which property was to be included in the NOPC.  He was assured that the NOPC would not affect K&H's property, and no evidence was presented suggesting that K&H's right to develop the property commercially would be affected.  The County approved the NOPC and enacted Ordinance 2002-18.  (*Id.,* ¶¶44-49).

Kelly Finney, an independent consultant working on K&H's behalf to obtain approval for K&H's planned development was variously informed by County employees that "all the density within 208/308 was allocated for the Howard Group," the question of density/intensity was a "civil matter," and that nothing could be built on Parcels 208/308 except by the Howard Group.  An employee of Intrawest also told Ms. Finney the same thing.  (*Id.,* ¶¶ 50-54, 56).

On March 3, 2004, K&H executed a $1,650,000.00 contract for sale of its property to Parish National Bank.  Keith Howard met with Stephen Akers, the Vice President of Parish National Bank while the sale was pending and told him that the K&H property could not be built upon because there was no density left, and that Parish would only be purchasing an overpriced parking lot.   Howard tried to

convince Akers to lease property from Howard.   Akers canceled the purchase agreement on October 29, 2004, citing statements made by Howard as the reason. Howard also interfered with other attempts to sell the property.  (*Id.,* ¶¶ 57-60, 65).

K&H states that it has not been able to develop its property as the Howard defendants were able to do.  It contends that if it is successful in this case and is allowed to develop the property it would be subject to Ordinance No. 2006-02, which will assess new and additional large impact fees that it would not have incurred had it been allowed to develop when it first sought to do so. (*Id.,* ¶¶ 63, 66-68)

The eight-count verified amended complaint contained the following claims:

Count I–Tortious interference with business relationship against the Howard defendants

Count II–Equal protection violation under 42 U.S.C. § 1983 against all defendants

Count III– Substantive Due process violation under 42 U.S.C. § 1983 against all defendants

Count IV– Equitable Estoppel against Walton County

Count V–Conversion against the Howard defendants

Count VI–Fraudulent Misrepresentation against the Howard defendants, Sandestin and Intrawest

Count VII–Inverse condemnation under Article X, § 6(a) of the Florida Constitution against Walton County

Count VIII–Civil Theft against the Howard defendants.

(Doc. 49).

Plaintiff sought compensatory, special, and punitive damages, pre- and post-judgment interest thereon, attorneys' fees and costs, injunctive relief, and any other relief the court deems just and proper.[5]

---

[5]Not all forms of relief were requested with respect to each count of the complaint.

In response to the Verified Amended Complaint, Walton County and the Howard Group Defendants answered (Doc. 64, 69), while the remaining defendants moved to dismiss (Doc. 61, 62). The Howard Defendants also filed a counterclaim against K&H, adding Howard affiliated companies Baytowne Commercial Joint Venture Partners, Baytowne Commercial Joint Venture Partners II, Baytowne Office Plaza Joint Venture Partners and Baytowne Restaurant Sites, Inc., as Counter-Plaintiffs (Doc. 69). Upon denial of the motions to dismiss (Doc. 128), Intrawest and the SOA also answered the Verified Amended Complaint (Doc. 129, 130, 132).

The defendants filed motions for summary judgment (doc. 181, 185, 187 & 191) which were pending when, on July 8, 2008, the plaintiff filed a supplemental pleading to join Bla-Lock Destin Development, Inc. ("Bla-Lock") as a plaintiff in this action. (Doc. 350).  The Supplemental Pleading addressed the fact that the K&H property had been sold in foreclosure.  Roger Murray, Jr. as plaintiff placed the high bid[6] for the property and assigned his bid and his rights to Bla-Lock.  (Doc. 350 at 3-4).  Title to the property thus transferred from K&H to Bla-Lock, who submitted an application to Defendant Walton County for approval of a development order for the property. Because defendant Intrawest did not acknowledge that the property had any development rights, Walton County would neither approve nor deny Bla-Lock's application.  (*Id.* at 4).  Plaintiffs sought damages and equitable relief based upon the date of transfer of title, attorney's fees and costs and other relief.  (*Id.* at 5).  No new theories of damages were specifically asserted.

After the supplemental pleading was filed, Intrawest filed a second motion for summary judgment or to dismiss for lack of subject matter jurisdiction, along with a statement of facts (doc. 355 & 356).  After reviewing that motion, this court denied all pending summary judgment motions without prejudice and directed the parties

---

[6]The amount of the bid was not stated in the Supplemental Pleading, although it was in excess of $2,600,000.00, which was the final bid placed by Keith Howard.  (Doc. 350 at 3).

to file superseding motions for summary judgment based on the newly discovered facts pertaining to the foreclosure sale of the subject property.  (Doc. 367).  Each of the parties has done so, (doc. 382, 385, 390 & 394), and plaintiffs have responded. (Doc.  404, 405, 408, 409, 414, 415, 416 & 417).

Defendant Intrawest argued in its superseding motion for summary judgment, among other things, that judgment should be entered in its favor because K&H and Bla-Lock  have no damages in light of the fact that the K&H property was sold at the foreclosure sale for $2,625,000, a sum well in excess of K&H's alleged damages for "lost" development rights as calculated by its own damages expert, appraiser Walter H.  Humphrey.

K&H served the expert report of appraiser Walter H. Humphrey, its damages expert, on or about August 10, 2007.  (Doc. 227-3; appendix 46).  The purpose of the appraisal as described on the Summary Appraisal Report itself was:

> to develop an opinion of the diminution in market value related to the entitlements for commercial improvements of 15,628 square feet (SF) compared to the absence of any future potential for development or structural improvement.

(Doc. 227-3 at 8).  The appraisal analysis of the property "as vacant" assumed alternatively that the land had no future potential for development or structural improvement and that the land had entitlements to construct 15,628 SF of commercial office and retail improvements.  (*Id.*).  Mr. Humphrey opined that the market value of the subject property as of November 14, 2002 with development options was $1,400,000.  Without any development potential, the property's value was $12,500, yielding a diminution in value (damages) of $1,387,500.  The market value as of September 28, 2006 with development options was $2,000,000 and only $12,500 without any development potential, for a total diminution in value (damages) of $1,987,500.  (*Id.* at 15).  These figures pertaining to the diminution in market value were the only numbers offered with respect to differential valuation of the property with or without development rights.

When defendants deposed Mr. Humphrey on September 19, 2007,[7] he stated that he had been tasked by plaintiff's counsel with developing an opinion of market value and any related dimunition of value in the subject property with or without the potential for commercial development or structural improvements.  (Doc. 355-4 at 5; Deposition of Walter H. Humphrey, page 13, lines 10-24).  Specifically, Humphrey explained he was "asked to prepare an analysis of market value under two separate sets of circumstances on the subject property; one, with a development order; and, two, without; and with the valuation dates of November 14, 2002 and September 28, 2006."  (Doc. 249-2 at 7, Humphrey Depo. at 9, I. 6-10).  Humphrey was then asked whether he had any opinions that were not reflected in his written report.  He stated "nothing of significance."  (Doc. 249-2 at 25, Humphrey Depo. at 74).  Counsel then asked "what about something of no significance," to which Humphrey responded that he thought the property "would be a good place for an eagle's nest."  (*Id.*)  He further stated that he had completed his assignment, and that he had not been asked to do anything in the future to supplement or modify this assignment.  (*Id.* as 25-26, Humphrey Depo. at 74-75).

Mr. Humphrey's report and supporting affidavit were filed four days after the discovery cut-off date, on September 25, 2007.  (Doc. 227-3).

Plaintiffs appended to their response to Intrawest's motion for summary judgment what Intrawest described as "an unsworn, unsubstantiated, never-before-disclosed letter from Mr. Humphrey dated September 29, 2008, which the plaintiffs euphemistically called an 'addendum' to his earlier report."  (Doc. 407 at 6).  Humphrey states in the body of the letter that it "appends" the previously prepared appraisal report.  In the letter, Mr. Humphrey addressed unspecified "questions" posited to him by plaintiffs' counsel, and discussed improved commercial sales in the area and rental/lease value of improved land.  (Doc. 404-11).  He assumed a

---

[7]Pursuant to the court's Order Adopting Discovery Plan, the deadline for all discovery in the case, including expert depositions and discovery, was September 21, 2007. (Doc. 100).

10,000 square foot ("SF") building or "land condo" on the land and stated that such would have sold for $5,000,000. With respect to rental income, Humphrey calculated that the owner of a 10,000 SF building would gross "$240,000 to $260,000 per year with minimal expenses for vacancy and credit losses, management, legal, accounting and reserves." (Doc. 404-11 at 2).

Defendant Intrawest filed a motion to strike and exclude this evidence, as well as the portions of plaintiff's statement of facts and memorandum of law in which "plaintiffs improperly seeks (sic) to change their damages theory in an effort to avoid summary judgment" (doc. 407 at 2). The other defendants joined in this motion. (Doc. 425, 426, 427). The court granted the motion on January 16, 2009, stating that in ruling on the pending motions for summary judgment, the court would not consider evidence presented in the expert's "addendum" or arguments made in reliance thereon. (Doc. 462).

<u>Plaintiff's allegations against Intrawest</u>

In the Parties and General allegations of K&H's verified amended complaint, it makes the following allegations with respect to defendant Intrawest:

(1) On August 6, 2002, Intrawest, by and through Connie D. Wynne, the Director of Development, Resort Development Group, submitted a Notice of Proposed Change ("NOPC")[8] for the Sandestin DRI that had been drafted by and for the benefit of Sandestin, the Howard and Intrawest defendants (¶¶ 34-35);

(2) After passage of the NOPC, Intrawest and the other defendants have represented to K&H and its representatives and third parties that the County transferred all the density and intensity on Parcels 208/308 to the Howard Group, and specifically, Judith Williams, an employee of Intrawest, informed Kelly Finney,

---

[8]This NOPC would transfer densities/intensities within Parcels 208/308 owned by the Howard Group. (¶¶ 37, 41).

an independent consultant working on behalf of K&H, that the Howard Group had acquired all the density/intensity on Parcels 208/308 (¶¶ 53, 56);

(3) The defendants have acted together and in reliance one on the other to deprive K&H of its property rights to develop or sell its property (¶ 64, 69).

Intrawest is named in three counts of the complaint.  In count II, K&H alleges that Intrawest acted jointly with or through Walton County officials and became so allied with the County as to be characterized as a state actor who was a joint participant in an enterprise with the other defendants to deprive K&H of its property rights.  (¶¶104-106).

K&H makes identical allegations in Count III to support its claim of a substantive due process violation.  (¶¶115-117).

In Count VI, K&H alleges that Intrawest, along with the SOA and Howard defendants, knowingly made false statements of material fact, or made statements not knowing whether they were true, intending that K&H would rely on the false statements. (¶¶ 145-147).  In particular, these defendants intended to misrepresent to K&H that there was no intent to disturb, disrupt, or take the commercial development rights allocated to K&H pursuant to Ordinance No. 2000-03.  (¶148). K&H relied on the false statements and suffered damages as a result.  (¶¶ 149-150). It contends that the misrepresentations by Intrawest and others evidenced reckless indifference to the rights of others, tantamount to an intentional violation of those rights.  (¶151).

In its motion for summary judgment, Intrawest moves for summary judgment as to liability on Counts II, III, and VI of the Verified Amended Complaint; or in the alternative for summary judgment against plaintiffs on K&H's compensatory and punitive damages claims; or in the alternative for dismissal for lack of subject matter jurisdiction on mootness grounds of plaintiff's claims based on K&H's compensatory and common law punitive damages claims and for summary judgment against Bla-Lock on its damages claim.  (Doc. 382 at 2).

<u>Summary Judgment Standard</u>

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); see also *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. See *id.*; see also *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity and Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. See *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000); *Ramsey v. Leath*, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from

it must be viewed in the light most favorable to the non-moving party. *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999). The court is not obliged to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50, 106 S.Ct. at 2511. And, it is improper for the district court to make credibility determinations, such as between contradictory affidavits, on a motion for summary judgment. *Miller v. Harget,* 458 F.3d 1251, 1256 (11th Cir. 2006); *Bischoff v. Osceola County,* 222 F.3d 874, 876 (11th Cir. 2000); *Harris v. Ostrout*, 65 F.3d 912, 916-17 (11th Cir. 1995); *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). This is because at the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. See *Anderson*, 477 U.S. 249. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.")

### Plaintiff's § 1983 claims

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. " *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55, 101 L.Ed.2d 40 (1988) (citations omitted); see also *Holmes v. Crosby*, 418 F.3d 1256 (11th Cir. 2005) (citing *West*). In *Adickes v. S.H. Kress & Co.*, the Supreme Court noted that a private party who is involved in a conspiracy with, i.e. is a willful participant in joint activity with, a state actor is acting "under color of law" for purposes of § 1983. *Adickes*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605-1606, 26 L.Ed.2d 142 (1970). A plaintiff attempting to

prove such a conspiracy must show that the parties "reached an understanding" to deny the plaintiff his or her rights. *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990) (citing *Addickes,* 398 U.S. at 152, 90 S.Ct. at 1605). The allegedly conspiratorial acts must impinge upon the plaintiff's federal right, and the plaintiff must prove an "actionable wrong" to support the conspiracy. *Bendiburg*, 909 F.2d at 468 (citations omitted). Nevertheless, the Eleventh Circuit has further explained a private party should only be viewed as a state actor for § 1983 purposes in rare circumstances. *Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001); *Wilson v. Dollar-Thrifty Auto Group South Fla.*, 286 Fed.Appx. 640 (2008).[9] Assuming a constitutional violation, to hold that private parties are state actors, the court must conclude that one of the following three conditions is met:

> (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) "the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise[ ]" ("nexus/joint action test").

*Rayburn,* 241 F.3d at 1347 (alterations in original) (citation omitted); *Wilson v. Dollar-Thrifty Auto Group South Fla.*, supra; *see also Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961) (originating the nexus/ joint action test).

K&H's claim for liability in counts II and III is based on the nexus/ joint action test. To sustain a claim under this test, the symbiotic relationship between the entities must involve the alleged constitutional violation. *Patrick v. Floyd Medical Center*, 201 F.3d 1313, 1316 (11th Cir. 2000) (See *National Broadcasting Co. v. Communications Workers*, 860 F.2d 1022, 1027 (11th Cir. 1988) (citing *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 547 n. 29, 107

---

[9]The undersigned cites *Wilson* only as persuasive authority and recognizes that the opinion is not considered binding precedent. *See* 11th Cir. R. 36-2.

S.Ct. 2971, 2986 n. 29, 97 L.Ed.2d 427 (1987)).  Each case is analyzed on its own facts to determine whether the interdependence between the private and state entities reflects sufficient state involvement to provide the basis for a § 1983 claim.  *Focus on the Family v. Pinellas Suncoast Transit,* 344 F.3d 1263, 1277 (11th Cir. 2003); *Patrick v. Floyd Medical Center*, 210 F.3d at 1315 (citing *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 726, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961)); *Willis v. University Health Services, Inc.*, 993 F.2d 837, 840 (11th Cir.1993) (examining relationship between private and public entities and finding insufficient symbiotic relationship to state a § 1983 claim).  The fact that a state entity may be liable for a private entity's acts under an agency theory does not automatically transform the private entity's action into state action.  *Patrick v. Floyd Medical*, 201 F.3d at 1316-1317 (noting that respondeat superior protects state agency from suit for injury inflicted solely by its agent).

Defendant Intrawest contends that it is entitled to summary judgment on K&H's civil rights claims because (1) it is a private corporate entity, not a state actor, and therefore cannot be held liable under 42 U.S.C. § 1983;[10] (2)  K&H does not rely on any actions of Intrawest to support its civil rights claims; (3) the facts of this case do not establish one of the narrow exceptions under which a private party can be liable as a state actor; (4) Bla-Lock did not exist at the time of the alleged violations, so its rights could not have been violated.

Plaintiffs respond that there was sufficient joint action between Walton County and Intrawest to establish Intrawest as a state actor, because the County delegated decision making on development to defendants Howard and Intrawest, and  these defendants were aided by Walton County in their attempts to prevent K&H from developing its land.  (Doc. 405 at 8).

---

[10] Taking this position does not require Intrawest to address the question of whether there is a constitutional violation. For purposes of this analysis only the court assumes that there was.

The question of whether Intrawest is in and of itself a state actor is easily resolved. The parties agree that Intrawest is a limited liability company, which is a private rather than governmental entity. (Doc. 49 at ¶ 8). As such, it cannot be held liable under § 1983 on this basis alone. It may be liable if, based on the facts of this case, its actions were tantamount to state action.

Intrawest contends that the facts as set forth in the complaint reveal that it was not the alleged "wrongdoer" in this case. K&H alleges in Count II that Walton County violated plaintiff's right to equal protection under the Fourteenth Amendment by selectively denying plaintiff the use and enjoyment of its property, while allowing other property owners of similarly situated properties, specifically the Howard defendants, to develop their property. In Count III plaintiff asserts that the County violated plaintiff's substantive due process rights by these same actions. Plaintiff does not suggest that the County acted alone in this alleged wrongdoing, however. In Count II, K&H alleges that the other defendants became so allied with the County as to have acted under color of state law, and that the County had so far insinuated itself into a position of interdependence with the defendants that it was a joint participant in depriving K&H of its rights. (Doc. 49, ¶¶105, 106). With respect to Count III, K&H alleged that the defendants infringed its substantive due process rights by acting jointly with or through County officials, and again that they became sufficiently allied with the County so as to qualify them as state actors. (Doc. 49, ¶¶ 115, 116).

Intrawest argues that the facts developed through discovery do not show that it is so intertwined with the County as to be subject to § 1983 liability. In making this determination, courts consider such factors as whether: (1) the public and private entities are separate and distinct under the law; (2) the private entity had discretion to hire and fire its own employees; (3) the private entity was responsible for maintenance and repair of its own facilities; (4) the private entity had the right to make its own rules and regulations; (5) the private entity agreed to indemnify the

public entity from liability; and (6) the private entity leased property from the public entity. See *Allocco v. City of Coral Gables,* 221 F.Supp.2d 1317 (S.D.Fla. 2002) (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 842-43, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (identifying factor six); *Patrick*, 201 F.3d at 1315 (identifying factors one through five)). The record is clear that Intrawest is a limited liability company based in Delaware, whereas Walton County, as a political subdivision of the State of Florida, is a separate and distinct legal entity. Intrawest hires and fires its own employees with no input from the County, and Intrawest is solely responsible for the maintenance and repair of its own facilities. Intrawest is governed by its Certificate of Formation and the Limited Liability Company Agreement of Intrawest Sandestin Company, L.L.C., which it drafted and it alone has the authority to amend. It alone prepared its internal operating procedures and the County has no input into or control over any of these. There is no indemnification agreement between Intrawest and the County, and Intrawest does not lease property from the County. (Doc. 398-4 at ¶¶ 34-40). A finding that none of these factors is present may lead to a conclusion that plaintiff cannot established state action under the nexus/joint action. *Allocco,* 221 F.Supp.2d at 1376.

State action may also be established by a conspiracy between a state actor and private entity. To prove a § 1983 conspiracy, K&H must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Ciambriello v. County of Nassau,* 292 F.3d 307 (2nd Cir. 2002) (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2nd Cir. 1999)); *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008) ("to sustain a conspiracy action under § 1983 a plaintiff must show an underlying actual denial of his constitutional rights and that the defendants reached an understanding to deny the plaintiff's rights"); *Harvey v. Harvey,* 949 F.2d 1127, 1133 (11th Cir. 1992) (private

parties conspiring with state actor act under color of state law may be liable under § 1983); *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980).

Intrawest cites the following excerpt from the deposition of K&H president Roger Murray, where Murray was questioned by counsel for Keith Howard, as proof that K&H cannot prove a factual basis for a conspiracy claim:[11]

> Q:   All right.  Referring to Paragraph 15 of your answers [to Defendant' Intrawest's first interrogatories to plaintiff], there is a sentence that says, 'After the NOPC was adopted the Intrawest Defendants conspired with Walton County through its staff to prohibit Murray from developing his property at all.'  What specific individuals within Walton County were involved in that conspiracy?

> A:   I cannot tell you the specific individuals.  Depositions will probably disclose that as time goes on, if it has not already.  I can only tell you that those in authority at the  time that were looking at the situation are the ones.

> Q:   What specific individuals do you refer to as the Intrawest Defendants were involved in that conspiracy?

> A:   The same answer.

> Q:   That you don't know as you sit here today?

> A:   Not in particular.  Those in authority who were involved in the decision.

> Q:   At the time that you signed this verification on March 26, 2007, who did you believe was involved in this conspiracy?

> A:   Those in authority with both entities.

> Q:   You don't know any particular names?

> A:   It could be several, but I don't know the names.  Other people were handling it.

---

[11]The deposition was held on July 18, 2007, the last day of law witness discovery under the Court's Order Adopting Discovery Plan (doc. 100).

(Doc. 191-5, Deposition of Roger Murray at 53-54).  The fact that K&H president was personally unable to articulate the basis for a conspiracy claim at his deposition does not defeat plaintiff's claim.

K&H maintains that the fact that the County delegated decision-making on development to Howard and Intrawest provides an adequate basis for holding Intrawest accountable as having been involved in a conspiracy with a state actor, or at least raising a question of fact in this regard.  The court concurs.

Kelly Finney, the consultant hired by K&H, testified that she had been told by county employees Pat Blackshear and Renee Bradley that until she got something from Judith Williams of Intrawest, it was a futile effort to submit a development application on K&H's behalf.  (Doc. 235-2 at 28, Finney Deposition; doc. 235-12/exhibit 96).  At her deposition, Pat Blackshear was asked whether the County was deferring to Intrawest to determine whether or not the K&H property has any development rights.  (Doc. 235-6 at 36).  She responded that this was correct "from the standpoint of their transfer of development rights through contract" but that she did not know "how they did it on the private sector side."  (*Id.*).  Ms. Blackshear also referred to the matter of the development rights as a "civil matter." (Doc. 235-12/exh. 96).  Daniel Ruff Winchester[12] testified that in his opinion the land use authority in Walton County had been improperly delegated under 380.06(17), Florida Statutes and 9J-2.027(3)(a) Florida Administrative Code.  (Doc. 225-7 at 49-53).  There was clearly some advance knowledge of the contentiousness of this issue and potential litigation, as Jim Boivin of Intrawest testified that there had been discussions with Keith Howard and Baytowne about indemnifying Intrawest if K&H sued about the development rights, although it is not clear that the draft agreement was ever executed.  (Doc. 225-14 at 33, Boivin Deposition; doc. 219-7/exhibit 131).

---

[12]Daniel Winchester is a former Florida County Commissioner, land planner and former staff planner with the Florida Department of Community Affairs (the Florida regulating authority over DRIs).

The court finds that there is sufficient factual dispute about the nature of the relationship and agreement between Intrawest and the County to survive a motion for summary judgment on the question of whether Intrawest can be held liable for having conspired with a state actor.[13]

The court's analysis of the plaintiffs' federal claims with respect to the defendant Intrawest might have ended here, as Intrawest neither briefed the question of whether a constitutional violation occurred nor adopted the arguments of its co-defendants.  However, both the County and the Howard defendants have raised and briefed the issue and the plaintiff has had the opportunity to respond.  The court finds that the analysis adopted by the court after consideration of the other defendants' arguments is equally applicable to the plaintiffs' claims against Intrawest.  Therefore, it is in the interest of judicial economy to apply that analysis to this defendant as well, as no discernible benefit would accrue from requiring Intrawest to file a third motion for summary judgment to make the same arguments.

### Plaintiffs' Equal Protection Claim

In Count II of the complaint, plaintiffs claim that Intrawest acted in concert with the County and the other defendants to violate the Equal Protection clause of the Fourteenth Amendment.  They allegedly did this by denying K&H, and later Bla-Lock, the ability to develop the K&H property while allowing similarly situated property owners to develop their property.

Section 1983 proscribes conduct that deprives a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55, 101 L.Ed.2d 40 (1988) (citations omitted); *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005).  Its scope is limited, however.  The Eleventh Circuit has noted that "federal courts should be disinclined

---

[13]The court's analysis ends here as in its motion Intrawest did not address the question of whether the underlying substantive constitutional violation existed.

to sit as a zoning board of review, and as a general rule, zoning decisions will not usually be found by a federal court to implicate constitutional guarantees." *Campbell v. Rainbow City,* 434 F.3d 1306,1313 (11th Cir. 2006) (quoting *Greenbriar Village, L.L.C. v. Mountain Brook, City*, 345 F.3d 1258, 1262 (11th Cir. 2003) (per curiam) (internal quotations omitted)).   Still, the Equal Protection Clause requires government entities to treat similarly situated individuals alike, and this protection is not limited to members of a vulnerable class.  *Id.*  A plaintiff may raise what is referred to as a "class of one claim" where the plaintiff alleges that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Id.* (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam)).

At the crux of a successful equal protection claim is the similarity of the two comparators.  Different treatment of dissimilarly situated persons does not offend the Equal Protection Clause.  *Campbell*, 434 F.3d at 1314 (citing *E&T Realty v. Strickland*, 830 F.2d 1107, 1112 (11th Cir. 1987)).  Equal protection plaintiffs must provide specific details in making their claims so the court may determine whether the proposed comparator was similarly situated in "all relevant respects." *Campbell*, 434 F.3d at 1314 (citing *Strickland v. Alderman*, 74 F.3d at 264-65; *Racine Charter One, Inc. v. Racine Unified School Dist.,* 424 F.3d 677, 680 (7th Cir. 2005) (finding that "[t]o be considered 'similarly situated,' comparators must be prima facie identical in all relevant respects")); *Griffin Industries, Inc., v. Irvin*, 496 F.3d 1189 (11th Cir. 2007); *Knight v. Baptist Hosp. of Miami, Inc.,* 330 F.3d 1313, 1316-19 (11th Cir. 2003); *Maulding Development, L.L.C. v. City of Springfield, Ill.*, 453 F.3d 967 (7th Cir. 2006). This is a heavy burden, and "when plaintiffs in 'class of one' cases challenge the outcome of complex, multi-factored government decisionmaking processes, similarly situated entities 'must be very similar indeed.'" *Griffin Industries*, 496 F.3d at 1205 (citing *McDonald v. Vill. Of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)). Although whether individuals are similarly situated is generally a factual question,

"a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004) (citations omitted).

The *Campbell* case provides relevant guidance with respect to the nature of the differences that can render comparators dissimilar for purposes of equal protection analysis. The *Campbell* plaintiffs were real estate developers who sued Rainbow City after it denied their application for tentative approval of a proposed building project,[14] claiming violations of their rights to free speech and equal protection. After a jury verdict in favor of the developers, the trial court denied the City's motion for judgment as a matter of law. The Eleventh Circuit reversed, finding that the comparators identified by the plaintiffs were not sufficiently similar to state an equal protection claim. It found that some of the comparators were inadequate simply because there was no record evidence that they had ever applied for a tentative approval, as had the plaintiffs. Plaintiffs were faulted for their failure to show what documentation other proposed comparators had brought before the Planning Commission in seeking tentative approval for their projects. 434 F.3d at 1315. Finally, several development projects that sought and received tentative approval were distinguished on factors including the kind and number of variances sought, whether the projects met density requirements, the documentation provided to the Planning Commission, the developers' compliance with Planning Commission requirements, and the size of the developments. *Id.* at 1316-1317. Because plaintiffs failed to present evidence of the City's different treatment of a development that was similarly situated to their proposed development in size, impact, and in type of approval sought from the city, among other things, they did not meet their burden of establishing an equal protection claim. The Eleventh Circuit found that on the

---

[14]The *Campbell* plaintiffs applied for permission to build an apartment complex that would exceed density, setback and other requirements in the city's ordinances. The City's Planning Commission denied the request for tentative approval, and it was this denial that provided the basis for the alleged damages. 434 F.3d at 1315.

record before it, there was therefore no factual basis for a reasonable jury to find for the plaintiffs on an equal protection claim and the motion for judgment as a matter of law should have been granted.  *Id.* at 1317.

Additional illustration of the stringent nature of the "similarly situated" requirement is found in *Griffin Industries Inc. v. Irwin*.  In that case, the plaintiff was a chicken rendering plant that claimed it had been singled out for punitive action, while other similarly situated plants were not subjected to similar regulation.  496 F.3d at 1202.  Defendant state officials successfully moved to dismiss the plaintiff's due process claims, and appealed the denial of the motion to dismiss equal protection and conspiracy claims.  In analyzing plaintiff's claims, the Eleventh Circuit noted that the government's challenged regulatory action was "undeniably multi-dimensional, involving varied decision-making criteria applied in a series of discretionary decisions made over an extended period of time."  496 F.3d at 1203.  However, it found that plaintiff's own complaint showed that it was not similarly situated to its chosen comparator, another chicken rendering plant, in several critical respects.  Unlike its comparator, plaintiff had recently increased the volume of its rendering activity.  There was a coinciding increase in citizen complaints, and plaintiff was also under political pressure as a result of unhappy citizens.  Most critical, however, was that the comparator self-reported potential pollution problems, while the plaintiff did not.  496 at 1206.  All of these factors together led the court to conclude that the plaintiff failed to state a claim for a "class of one" equal protection violation because it had failed to identify a similarly situated comparator.  496 F.3d at 1207.

In the case at bar, plaintiffs' expert appraiser Walter Humphrey testified at his deposition that he has previously been qualified as an expert witness in the Northern District of Florida to issue opinions on whether properties were similarly situated. (Doc. 235-4 at 76).  He opined after looking at developed properties near the K&H

property that they were "quite similar." (Doc. 235-4 at 76-77).  Specifically, he found that:

> they're both on the north side of Highway 98.  They're both within the Sandestin general market area.  In terms of access, they do have a road that goes between them so their access would be a little bit better, but neither one has direct access from Highway 98.  It's from the side street which I believe goes to the back gates at Sandestin also.

(*Id.* at 77).  Plaintiffs assert that the Howard property is an appropriate comparator because the Howard and K&H properties are both within the Sandestin DRI, both are within the area designated as a single area for development by Walton County as Parcel 208/308, and the properties are of similar size and topography and are suitable for similar uses. As illustrated by the case law summarized above, however, mere geographic comparison is insufficient.

K&H and Bla-Lock have not established that their respective properties were "similarly situated" under the controlling case law.  K&H initially obtained the 1.453 acre parcel via a quit claim deed which reflects no reservation or transfer of density or intensity.  There is no other document from the seller to K&H through which K&H claims to have acquired commercial density, and no document that specifically identifies any density/intensity rights being assigned to the K&H land.  (Doc. 193-3, Murray Deposition at 62, doc. 197-2, Gardner Deposition at 53-54).  There is likewise no record evidence that plaintiffs have subsequently purchased density/intensity from the DRI developer, Intrawest.   The Howard Group, on the other hand, contracted to purchase both land and density/intensity for monetary and non-monetary consideration.  (Doc. 194-3, Howard deposition, at 63, 68-69).

The K&H property is not the only one with development issues.  There are other parcels of property in the Sandestin DRI without density or intensity, including a parcel owned by the Howard Group for which they have unsuccessfully tried "for quite some time" to obtain density or intensity.  (Doc. 202-6, Askew Deposition at 60-62), doc. 194-3, Howard Deposition at 63, 38).  The Howard Group has also sold

property within Parcels 208/308 without development rights, such that the purchaser had to obtain approval from the DRI Declarant to develop the property. (Doc. 194-3, Howard Deposition at 26).  The Howard Group itself also has purchased property and separately negotiated to purchase additional development rights on the property. (*Id.* at 38-42).  Density/intensity did not necessarily run with the land, as Walton County public records reflect numerous documents showing that property owners purchased, reserved, obtained options to purchase or otherwise obtained rights to density/intensity from the DRI Developer within the Sandestin DRI.  (Doc. 395 at ¶ 86).

Another difference between the plaintiffs and the Howard defendants is that the plaintiffs never actually applied to Walton County Building Department or Board of County Commissioners for a development permit for the K&H land, although they believed the exercise to be futile.  (Doc. 202-4, Finney Deposition at 27-28; doc. 193-2, Murray Deposition at 116-117, 128-129; doc. 188-2, Blackshear Affidavit ¶ 16).

While plaintiffs are correct that there is no precise formula to determine whether individuals are "similarly situated," they have not adequately rebutted these specific distinctions, instead stating simply that there "are no distinguishing factors herein between the Defendant Howard's properties and the K&H property."  (Doc. 416 at 10).  Based on the foregoing, plaintiffs have not established that they were similarly situated to their chosen comparator, "in light of all the factors that would be relevant to an objectively reasonably governmental decisionmaker."  *Griffin Industries*, 496 F.3d at 1207.  They also have not established that the defendants' actions were irrational and arbitrary.  The plaintiffs having shown no equal protection violation, defendant is entitled to summary judgment on this claim.

### Plaintiffs' Substantive Due Process Claim

In Count III of the complaint, plaintiff claims that Intrawest acted in concert with the County and the other defendants to violate plaintiffs' substantive due process rights to sell or develop the K&H property.

A substantive due process claim originates in the Fourteenth Amendment provision stating that "No state shall . . . deprive any person of life, liberty, or property, without due process of law. . ."  U.S. Const. amend XIV, § 1.   The Due Process clause incorporates a guarantee to both substantive and procedural due process.  See *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990).   "Substantive due process" includes protection against "certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."  *Id.*  (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.C.t 662, 665, 88 L.Ed.2d 662 (1986)); *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992).

The right asserted in this case is plaintiffs' right to develop their property.  It is well-accepted that property interests are not created by the Constitution, but are created and defined "by existing rules or understandings that stem from an independent source such as state law," and they arise only where the plaintiff demonstrates a "legitimate claim of entitlement. " *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)); *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756, 125 S.Ct. 2796, 2803, 162 L.Ed.2d 658 (2005); *Paul v. Davis,* 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); *DeKalb Stone, Inc. v. County of DeKalb, GA,* 106 F.3d 956, 959 (11th Cir. 1997) ("It is well established that land use rights, as property rights generally, are state-created rights." (citing *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709)); *Key West Harbour Development Corp. v. City of Key West, Fla.,* 987 F.2d 723, 727 (11th Cir. 1993); *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989)).  Thus, the property rights claimed by plaintiffs in this case are state-created rights.  *DeKalb Stone*, 106 F.3d at 959.  Areas in which substantive

rights are created only by state law are not subject to substantive due process protection under the Due Process Clause because "substantive due process rights are created only by the Constitution." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed.2d 523 (1985)); *Greenbriar Village, L.L.C. v. Mountain Brook City*, 345 F.3d 1258, 1262 (11th Cir. 2003) ("[T]o the extent that Greenbriar predicates it substantive due process claim directly on the denial of its state-granted and –defined property right in the permit, no substantive due process claim is viable.").

As in *DeKalb Stone*, the question in this case is whether plaintiffs may bring a cause of action for a substantive due process violation, which purported to deprive them of a state-created property right. 106 F.3d at 959.  The *DeKalb Stone* court found generally that no substantive due process violation lies where there is an executive deprivation of a state-created right. *DeKalb Stone*, 106 F.3d at 960 (citing *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) (employment rights after challenge to termination); *C.B. ex rel. Breeding v. Driscoll*, 82 F.3d 383 (11th Cir. 1996)(state education rights after student challenges to suspensions)).

In Count II of the complaint, plaintiff claims that Intrawest acted in concert with the County and the other defendants to violate the Equal Protection clause of the Fourteenth Amendment by denying K&H, and later Bla-Lock, the ability to develop the K&H property while allowing similarly situated property owners to develop their property.  Property rights are state created rights, and enforcement of existing zoning regulations is an executive, rather than legislative act.  *Id.* (*Citing Crymes v. DeKalb County*, 923 F.2d 1482, 1485 (11th Cir. 1991) (citations omitted)). Therefore no cause of action for a substantive due process violation will lie where an executive actor deprives the plaintiff of his state created property right.  *DeKalb Stone*, 106 F.3d at 959-960 (citing *McKinney*,  *Driscoll*, and *Boatman v. Town of Oakland*, 76 F.3d 341, 346 (11th Cir. 1996)(no federal substantive due process claim arose where property owner alleged that town executives arbitrarily and capriciously

refused to issue certificate of occupancy)); see also *Kauth v. Hartford Ins. Co. of Ill.*, 852 F.2d 951, 956-58 (7ᵗʰ Cir. 1988)); *Roberts v. City of Orange Beach*, 2001 WL 530696 (S.D. Ala. 2001) (following *DeKalb Stone*).

The different between "legislative" acts and acts that are "non-legislative" or "executive" is critical to the inquiry. *McKinney v. Pate*, 20 F.3d at 1557 n.9 (citing *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979)). "Executive acts characteristically apply to a limited number of persons (and often to only one person)" and they "typically arise from the ministerial or administrative activities of members of the executive branch." *McKinney*, 20 F.3d at 1557 n. 9. Legislative acts generally apply to a larger segment of, if not all of, society. *Id.*; *DeKalb Stone*, 106 F.3d at 959 (a "legislative act involves policy-making rather than mere administrative application of existing policies.") (citing *Crymes v. DeKalb County*, 923 F.2d 1482, 1485 (11ᵗʰ Cir. 1991)(citations omitted)); *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139 n.1 (3ʳᵈ Cir. 2000) (Executive acts . . . typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society."). Non-legislative deprivations of state-created rights, which would include land-use rights, cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrarily and irrationally. *Greenbriar*, 345 F.3d at 1263 (citing *McKinney*, 20 F.3d at 1559).

The Florida Supreme Court has held that enactments of original zoning ordinances "have always been considered legislative."[15] *Board of County Com'rs of Brevard County v. Snyder*, 627 So.2d 469 (Fla. 1993) (citing *Gulf & Easter Development. Corp. v. City of Fort Lauderdale,* 354 So.2d 57 (Fla. 1978); *County of*

---

[15]Whether an action is legislative or quasi-judicial determines the level of review it receives under Florida law. A board's legislative action is subject to attack in circuit court under a deferential "fairly debatable" standard of review, while rulings of a board acting in its quasi-judicial capacity are subject to review by certiorari and will be upheld only if they are supported by substantial competent evidence. *Snyder*, 627 So.2d at 474; *Coastal Development of North Florida, Inc. v. City of Jacksonville Beach*, 788 So.2d 204 (Fla. 2001).

*Pasco v. J.Dico, Inc.,* 343 So.2d 83 (Fla. 2ⁿᵈ DCA 1977)). The *Snyder* court referenced cases where a comprehensive amendment to a zoning ordinance, and two instances of board action on specific rezoning applications of individual property owners were considered legislative acts. 627 So.2d at 474 (citing *Schauer v. City of Miami Beach*, 112 So. 2d 838, 839 (Fla. 1959); *City of Jacksonville Beach v. Grubbs*, 461 So.2d 160, 163 (Fla. 1ˢᵗ DCA 1984); *Palm Beach County v. Tinnerman,* 517 So.2d 699, 700 (Fla. 4ᵗʰ DCA 1987)). It noted that the character of the hearing determines whether the board action is legislative or quasi-judicial. Legislative action results in the *formulation* of a general rule of policy, whereas judicial action results in the *application* of a general rule of policy. *Id.* (citations omitted). Although comprehensive rezonings that affect a large portion of the public are legislative in nature, the court stated:

> [R]ezoning actions which have an impact on a limited number of persons or property owners, on identifiable parties and interests, where the decision is contingent on a fact or facts arrived at from distinct alternatives presented at a hearing, and where the decision can be functionally viewed as policy application, rather than policy setting, are in the nature of ... quasi-judicial action....

627 So.2d at 474. It later held in another case, however, that the decision to amend a comprehensive land use plan is a legislative decision, even if the amendment affects only a single parcel of property. *Martin County v. Yusem*, 690 So.2d 1288, 1293-1295 (Fla. 1997); *D.R. Horton, Inc.–Jacksonville v. Peyton,* 959 So.2d 390, 399 (Fla. 1ˢᵗ DCA 2007). It explained the lengthy process by which such an amendment may be adopted, and stated that there is no reason to treat a county's decision with respect to a modification of a previously adopted land use plan as any less legislative in nature than the decision initially adopting the plan. 690 So.2d at 1294. Finally, in yet another case, the Supreme Court of Florida held that the denial of a proposed small-scale development amendment to a City's comprehensive plan was legislative in nature because it implicated changes to the future land use element of the plan, and therefore a policy decision. *Coastal Development of North Florida, Inc.*

*v. City of Jacksonville Beach*, 788 So.2d 204, 205-208 (Fla. 2001); *D.R. Horton, Inc.–Jacksonville,* 959 So.2d at 400.   The court noted in passing that there are administrative remedies available to aggrieved parties in the small-scale development amendment context that are not available in the zoning context.  788 So. 2d at 209.

Plaintiffs assert that the County's adoption of the 2002 and 2004 NOPCs were legislative acts that were used by the defendants to keep K&H from developing its property.[16]  But the facts prove otherwise.  All plaintiffs have been able to show is that their inability to develop the K&H property as resulted from the County's enforcement of zoning regulations against a single property owner.  As such, it is an executive act that does not support a substantive due process claim.  See *DeKalb Stone*, 106 F.3d at 959; cf. *Everett v. City of Tallahassee*, 840 F.Supp. 1528, 1546 (N.D. Fla. 1992) (ad hoc application of uncodified and unconstitutional policy to deny plaintiff's rezoning request violates plaintiff's substantive due process rights).  The adoption of the NOPC took place after an August 7, 2002 application which was considered at a single hearing.   (Doc. 49 ¶¶ 43-48).   Plaintiffs themselves characterized the Land-Use hearing at which the NOPC was adopted as a "quasi-judicial" hearing.   (Doc. 415 at 13).   Even if the adoption of the NOPC were a legislative act, it is just one aspect of the plaintiffs' case.  And, K&H President Roger Murray testified on July 18, 2007 that the 2002 NOPC had no effect on his density rights. (Doc. 240-10 at 143-144).  Finally, in plaintiffs' complaint they allege that they were granted certain DRI density/intensity rights under Walton County Ordinance 2000-03 and that "no subsequent ordinance has affected K&H's property rights as it pertains to this piece of property."  (Doc. 49 at ¶¶ 23, 26, 49).  In other words, plaintiffs' own characterizations of the NOPCs and ordinances undercut their claims.

---

[16]If this is true, under the case law cited herein K&H could have immediately filed an original action in the appropriate circuit court challenging the decision under the "fairly-debatable" standard.

Case 3:06-cv-00494-MD   Document 483   Filed 03/27/09   Page 30 of 31

*Page 30 of 31*

Thus, the record does not support a substantive due process claim, and the defendant Intrawest is entitled to summary judgment.

### Supplemental Jurisdiction over State Law Claims

In Count VI of the verified amended complaint, K&H asserts a state law claim for fraudulent misrepresentation against Intrawest, the Howard defendants and the SOA.  Plaintiff brings this claim pursuant to the court's supplemental jurisdiction under 28 U.S.C. § 1367.  It is well-established that once a plaintiff's federal claims are dismissed, there remains no independent federal jurisdiction to support the court's exercise of supplemental jurisdiction over the state claims against defendants.  See *Baggett v. First National Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir. 1997). Title 28 U.S.C. § 1367(c)(3) provides that the district court may decline to exercise supplemental jurisdiction over claims after it has dismissed all claims over which it has original jurisdiction.  See also *United Mine Workers v. Gibbs,* 383 U.S. 715, 725-26, 86 S.Ct. 1130, 1138-39, 16 L.Ed.2d 218 (1966).  Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction. *Baggett*, 117 F.3d at 1353 (citing *Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1569 (11th Cir. 1994); *Executive Software N. Am. v. United States Dist. Court*, 15 F.3d 1484, 1493 (9th Cir. 1994); *New England Co. v. Bank of Gwinnett County*, 891 F.Supp. 1569, 1578 (N.D.Ga.1995); *Fallin v. Mindis Metals, Inc.*, 865 F.Supp. 834, 841 (N.D.Ga.1994)); see also *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002).  "Both comity and economy are served when issues of state law are resolved by state courts." *Rowe*, 279 F.3d at 1288.  The argument for dismissing the state law claims in order to allow state courts to resolve issues of state law is even stronger in a situation such as this when the federal claims have been dismissed prior to trial.  *Id.*  While it would be convenient for the plaintiffs to continue litigating this case in their chosen forum, the discretion on whether to exercise supplemental jurisdiction is

*Case No: 3:06cv494/MD*

vested in the sound discretion of the district court.  *Rowe*, 279 F.3d at 1288.  The court is not inclined to exercise its jurisdiction under the circumstances of this case, as doing so would require this court to address important issues of substantive state law, including matters of state constitutional law as to the County defendant. Therefore, Count VI of the complaint will be dismissed as to Intrawest.


An appropriate Order will be entered in accordance with the foregoing memorandum opinion.

At Pensacola, Florida this 27th day of March, 2009.



/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**