IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


**K & H DEVELOPMENT GROUP, INC,**
**a Florida Corporation, and BLA-LOCK**
**DESTIN DEVELOPMENT, INC.,**
            **Plaintiffs,**

**vs.**                                            No.   3:06cv494/MD

**KEITH HOWARD; THE HOWARD**
**COMPANY OF THE SOUTHEAST, INC.,**
**a Florida Corporation; INTRAWEST**
**SANDESTIN COMPANY, L.L.C., a**
**Foreign Corporation; INTRAWEST**
**RESORTS, a Foreign Corporation;**
**SANDESTIN OWNERS ASSOCIATION, INC.,**
**a Florida Non-Profit Corporation; and**
**WALTON COUNTY, FLORIDA, a**
**subdivision of the State of Florida,**
            **Defendants.**

---

### MEMORANDUM OPINION ON SANDESTIN OWNERS' ASSOCIATION'S SUPERSEDING MOTION FOR SUMMARY JUDGMENT

        Before the court are the superseding motion for summary judgment, motion to dismiss for lack of subject matter jurisdiction and supporting memorandum filed by defendant Sandestin Owners Association Inc. (doc. 385) and supporting statement of facts (doc. 386) along with plaintiff's response in opposition to the motion (doc. 40jurisdiction by referral after the parties consented to the exercise of jurisdiction by the undersigned magistrate judge.

### Case history and procedural background

Plaintiff K&H Development Group, Inc., a Florida corporation ("K&H") filed its original Verified Complaint (Doc. 1) against Keith Howard and The Howard Company of the Southeast, Inc. (collectively, the "Howard Defendants"); Intrawest Sandestin Company, L.L.C., a foreign corporation ("Intrawest") and Intrawest Resorts, a foreign corporation;[1] Sandestin Owners Association, Inc., a Florida Non-Profit Corporation ("Sandestin" or "SOA"); and Walton County, Florida, a subdivision of the State of Florida, ("Walton County" or the "County"). Plaintiff alleged generally that, through the collective and individual efforts of the defendants, it had been prevented from developing property it owned on the north side of U.S. Highway 98 within the Sandestin Development of Regional Impact (hereafter, "DRI").[2]   After initial responses to that Complaint were filed, K&H sought, and was granted, leave to file a Verified Amended Complaint (Doc. 48, 49, 58).

According to the verified amended complaint (henceforth "complaint"),[3] K&H obtained a 1.453 acre piece of property by quitclaim deed from a company called Centaworld Holding Corporation on May 9, 2000. The K&H property is located within Parcels 208/308 as designated in the Sandestin DRI, which governs development within the Sandestin Resort. A DRI is defined by statute as "any development which, because of its character, magnitude or location, would have a substantial effect upon the health, safety, or welfare of citizens of more than one county." § 380.06(1), Fla. Stat. 2008. The Master Plan of defendant Walton County, where the property is located, was approved by the County for commercial development. K&H alleges in the complaint that at the time it acquired the property, it owned a proportionate

---

[1] Intrawest Resorts was terminated as a party on August 27, 2007 by agreement of the parties. (Doc. 180).

[2] A development of regional impact is "any development which, because of its character, magnitude, or location, would have substantial effect upon the health, safety, or welfare of citizens of more than one county." § 380.06(1) Fla. Stat. (2008).

[3] The allegations are summarized as they appear in the complaint, although evidence submitted in support of the motions for summary judgment indicates at least some minor variations from these facts.

share of commercial development rights.  Commercial development rights are generally measured in square feet of allowable development and referred to as "intensity," while residential development is usually measured in units and referred to as "density."[4]  Plaintiff asserts that there was no reservation or transfer of the allocated density or intensity affecting its property either in the May 9, 2000 transaction by quitclaim deed or in any previous transfer of title.  (Doc. 49, Complaint, ¶¶ 15-20)

Defendant Howard has attempted to purchase plaintiff's property to pursue development.  Howard also purchased a purported option to purchase land, including the K&H property, and filed suit for specific performance in Walton County when it was unable to acquire the K&H property.  (Id., ¶ 22).

Walton County Ordinance 2000-03, was approved on February 8, 2000 and modified the prior allocation of development rights.  The commercial development allocation to the entire 208/308 parcels was 398,000 square feet of commercial and 40,000 square feet of office development.  According to K&H, its proportionate share of the commercial development allocation was 14, 421 square feet of commercial and 1,207 square feet of office development.  It asserts that it has never sold or otherwise transferred development rights on ths property, and the development of this property has not been affected by subsequent ordinances.  (Id., ¶¶ 23-26).

In 2001, K&H was considering selling the property and retained a firm to design a sign that would comply with Sandestin Architectural Design Guidelines. It attempted to place a compliant sign bearing a contact person's name and phone number on the property, but was not permitted to do so, although the Howard Defendants were allowed to place a similar sign on their property.  After K&H was told that its sign met the architectural guidelines, the guidelines were intentionally changed so K&H's sign would no longer be acceptable.  This was allegedly due to

---

[4]The words "density" and "intensity" are often mistakenly interchanged. (¶ 19 n.1).

an agreement between the defendants to prevent K&H from selling or developing its property to anyone other than the Howard defendants. (*Id.,* ¶¶ 27-32).

On May 6, 2002 K&H notified Sandestin of its intent to proceed with development of the property. On August 6, 2002, Intrawest submitted a Notice of Proposed Change ("NOPC") for the Sandestin Development of Regional Impact ("DRI") which was drafted by and for the joint benefit of the defendants. The purpose of the NOPC was to create a mixed use commercial development on Parcels 208/308, and it suggested transferring densities to Parcels 208/308 and transferring densities and intensities within Parcels 208/308, increasing the intensity and density on the Howard-owned portion of Parcels 208/308. Keith Howard and others represented that the NOPC would not impact non Howard Group property owners (*Id.,* ¶¶ 33-43).

On November 4, 2002, the Walton County Board of County Commissioners considered the NOPC at a Land Use Hearing. Attorney Ken Goldberg, representing K&H, told the Board that there was conflicting information about which property was to be included in the NOPC. He was assured that the NOPC would not affect K&H's property, and no evidence was presented suggesting that K&H's right to develop the property commercially would be affected. The County approved the NOPC and enacted Ordinance 2002-18. (*Id.,* ¶¶44-49).

Kelly Finney, an independent consultant working on K&H's behalf to obtain approval for K&H's planned development was variously informed by County employees that "all the density within 208/308 was allocated for the Howard Group," the question of density/intensity was a "civil matter," and that nothing could be built on Parcels 208/308 except by the Howard Group. An employee of Intrawest also told Ms. Finney the same thing. (*Id.,* ¶¶ 50-54, 56).

On March 3, 2004, K&H executed a $1,650,000.00 contract for sale of its property to Parish National Bank. Keith Howard met with Stephen Akers, the Vice President of Parish National Bank while the sale was pending and told him that the

K&H property could not be built upon because there was no density left, and that Parish would only be purchasing an overpriced parking lot.   Howard tried to convince Akers to lease property from Howard.   Akers canceled the purchase agreement on October 29, 2004, citing statements made by Howard as the reason. Howard also interfered with other attempts to sell the property.  (*Id.,* ¶¶ 57-60, 65).

K&H states that it has not been able to develop its property as the Howard defendants were able to do.  It contends that if it is successful in this case and is allowed to develop the property it would be subject to Ordinance No. 2006-02, which will assess new and additional large impact fees that it would not have incurred had it been allowed to develop when it first sought to do so. (*Id.,* ¶¶ 63, 66-68)

The eight-count verified amended complaint contained the following claims:

Count I–Tortious interference with business relationship against the Howard defendants

Count II–Equal protection violation under 42 U.S.C. § 1983 against all defendants

Count III– Substantive Due process violation under 42 U.S.C. § 1983 against all defendants

Count IV– Equitable Estoppel against Walton County

Count V–Conversion against the Howard defendants

Count VI–Fraudulent Misrepresentation against the Howard defendants, Sandestin and Intrawest

Count VII–Inverse condemnation under Article X, § 6(a) of the Florida Constitution against Walton County

Count VIII–Civil Theft against the Howard defendants.

(Doc. 49).

Plaintiff sought compensatory, special, and punitive damages, pre- and post-judgment interest thereon, attorneys' fees and costs, injunctive relief, and any other relief the court deems just and proper.[5]

In response to the Verified Amended Complaint, Walton County and the Howard Group Defendants answered (Doc. 64, 69), while the remaining defendants moved to dismiss (Doc. 61, 62). The Howard Defendants also filed a counterclaim against K&H, adding Howard affiliated companies Baytowne Commercial Joint Venture Partners, Baytowne Commercial Joint Venture Partners II, Baytowne Office Plaza Joint Venture Partners and Baytowne Restaurant Sites, Inc., as Counter-Plaintiffs (Doc. 69). Upon denial of the motions to dismiss (Doc. 128), Intrawest and the SOA also answered the Verified Amended Complaint (Doc. 129, 130, 132).

The defendants filed motions for summary judgment (doc. 181, 185, 187 & 191) which were pending when, on July 8, 2008, the plaintiff filed a supplemental pleading to join Bla-Lock Destin Development, Inc. ("Bla-Lock") as a plaintiff in this action. (Doc. 350).  The Supplemental Pleading addressed the fact that the K&H property had been sold in foreclosure.  Roger Murray, Jr. as plaintiff placed the high bid[6] for the property and assigned his bid and his rights to Bla-Lock.  (Doc. 350 at 3-4).  Title to the property thus transferred from K&H to Bla-Lock, who submitted an application to Defendant Walton County for approval of a development order for the property. Because defendant Intrawest did not acknowledge that the property had any development rights, Walton County would neither approve nor deny Bla-Lock's application.  (*Id.* at 4).  Plaintiffs sought damages and equitable relief based upon the date of transfer of title, attorney's fees and costs and other relief.  (*Id.* at 5).  No new theories of damages were specifically asserted.

---

[5]Not all forms of relief were requested with respect to each count of the complaint.

[6]The amount of the bid was not stated in the Supplemental Pleading, although it was in excess of $2,600,000.00, which was the final bid placed by Keith Howard.  (Doc. 350 at 3).

After the supplemental pleading was filed, Intrawest filed a second motion for summary judgment or to dismiss for lack of subject matter jurisdiction, along with a statement of facts (doc. 355 & 356).  After reviewing that motion, this court denied all pending summary judgment motions without prejudice and directed the parties to file superseding motions for summary judgment based on the newly discovered facts pertaining to the foreclosure sale of the subject property.  (Doc. 367).  Each of the parties has done so, (doc. 382, 385, 390 & 394), and plaintiffs have responded.  (Doc.  404, 405, 408, 409, 414, 415, 416 & 417).

Defendant Intrawest argued in its superseding motion for summary judgment, among other things, that judgment should be entered in its favor because K&H and Bla-Lock  have no damages in light of the fact that the K&H property was sold at the foreclosure sale for $2,625,000, a sum well in excess of K&H's alleged damages for "lost" development rights as calculated by its own damages expert, appraiser Walter H.  Humphrey.

_____  K&H served the expert report of appraiser Walter H. Humphrey, its damages expert, on or about August 10, 2007.  (Doc. 227-3; appendix 46).  The purpose of the appraisal as described on the Summary Appraisal Report itself was:

> to develop an opinion of the diminution in market value related to the entitlements for commercial improvements of 15,628 square feet (SF) compared to the absence of any future potential for development or structural improvement.

(Doc. 227-3 at 8).  The appraisal analysis of the property "as vacant" assumed alternatively that the land had no future potential for development or structural improvement and that the land had entitlements to construct 15,628 SF of commercial office and retail improvements.  (*Id.*).  Mr. Humphrey opined that the market value of the subject property as of November 14, 2002 with development options was $1,400,000.  Without any development potential, the property's value was $12,500, yielding a diminution in value (damages) of $1,387,500.  The market value as of September 28, 2006 with development options was $2,000,000 and only

$12,500 without any development potential, for a total diminution in value (damages) of $1,987,500.  (*Id.* at 15).  These figures pertaining to the diminution in market value were the only numbers offered with respect to differential valuation of the property with or without development rights.

When defendants deposed Mr. Humphrey on September 19, 2007,[7] he stated that he had been tasked by plaintiff's counsel with developing an opinion of market value and any related dimunition of value in the subject property with or without the potential for commercial development or structural improvements.  (Doc. 355-4 at 5; Deposition of Walter H. Humphrey, page 13, lines 10-24).  Specifically, Humphrey explained he was "asked to prepare an analysis of market value under two separate sets of circumstances on the subject property; one, with a development order; and, two, without; and with the valuation dates of November 14, 2002 and September 28, 2006."  (Doc. 249-2 at 7, Humphrey Depo. at 9, I. 6-10).  Humphrey was then asked whether he had any opinions that were not reflected in his written report.  He stated "nothing of significance."  (Doc. 249-2 at 25, Humphrey Depo. at 74).  Counsel then asked "what about something of no significance," to which Humphrey responded that he thought the property "would be a good place for an eagle's nest."  (*Id.*)  He further stated that he had completed his assignment, and that he had not been asked to do anything in the future to supplement or modify this assignment.  (*Id.* as 25-26, Humphrey Depo. at 74-75).

Mr. Humphrey's report and supporting affidavit were filed four days after the discovery cut-off date, on September 25, 2007.  (Doc. 227-3).

Plaintiffs appended to their response to Intrawest's motion for summary judgment what Intrawest described as "an unsworn, unsubstantiated, never-before-disclosed letter from Mr. Humphrey dated September 29, 2008, which the plaintiffs euphemistically called an 'addendum' to his earlier report."  (Doc. 407 at 6).

---

[7] Pursuant to the court's Order Adopting Discovery Plan, the deadline for all discovery in the case, including expert depositions and discovery, was September 21, 2007. (Doc. 100).

Humphrey states in the body of the letter that it "appends" the previously prepared appraisal report.  In the letter, Mr. Humphrey addressed unspecified "questions" posited to him by plaintiffs' counsel, and discussed improved commercial sales in the area and rental/lease value of improved land.  (Doc. 404-11).  He assumed a 10,000 square foot ("SF") building or "land condo" on the land and stated that such would have sold for $5,000,000.  With respect to rental income, Humphrey calculated that the owner of a 10,000 SF building would gross "$240,000 to $260,000 per year with minimal expenses for vacancy and credit losses, management, legal, accounting and reserves."  (Doc. 404-11 at 2).

Defendant Intrawest filed a motion to strike and exclude this evidence, as well as the portions of plaintiff's statement of facts and memorandum of law in which "plaintiffs improperly seeks (sic) to change their damages theory in an effort to avoid summary judgment"  (doc. 407 at 2). The other defendants joined in this motion.  (Doc. 425, 426, 427).  The court granted the motion on January 16, 2009, stating that in ruling on the pending motions for summary judgment, the court would not consider evidence presented in the expert's "addendum" or arguments made in reliance thereon.  (Doc. 462).

### Plaintiffs' allegations against defendant Sandestin

In the Parties and General allegations of K&H's verified amended complaint, it makes the following allegations with respect to defendant Sandestin:

(1) Sandestin is a Florida non-profit corporation with its principal place of business in Destin, Florida (¶ 11);

(2) Sandestin treated K&H and the Howard defendants differently when it refused to allow K&H to place a "for sale" type sign on its property while allowing the Howard defendants to do so, that it intentionally changed guidelines regarding appropriate signage after approving K&H's sign, and that it had an agreement with

the Howard defendants that it would assist them in their attempts to prevent K&H from selling or developing its property (¶¶ 29-32, ¶ 61, 65);

(3) an August 6, 2002 Notice of Proposed Change (NOPC) for the Sandestin Development Region Impact ("DRI") development was drafted by and for the benefit of Sandestin, the Howard and Intrawest defendants (¶35);

(4) Sandestin and the other defendants have represented to K&H and third parties that the County transferred all the density and intensity on Parcels 208/308 to the Howard Group (¶ 56); (5) Sandestin has acted together with the other defendants to deprive K&H of its rights to develop its property (¶64).

Sandestin is named in three counts of the complaint.  In count II, K&H alleges that Sandestin acted jointly with or through Walton County officials and became so allied with the County as to be characterized as a state actor who was a joint participant in an enterprise with the other defendants to deprive K&H of its property rights.  (¶¶104-106).

K&H makes identical allegations in Count III to support its claim of a substantive due process violation.  (¶¶115-117).

In Count VI, K&H alleges that Sandestin, along with the Howard and Intrawest defendants, knowingly made false statements of material fact, or made statements not knowing whether they were true, intending that K&H would rely on the false statements.  (¶¶ 145-147).  In particular, these defendants intended to misrepresent to K&H that there was no intent to disturb, disrupt, or take the commercial development rights allocated to K&H pursuant to Ordinance No. 2000-03.  (¶148). K&H relied on the false statements and suffered damages as a result.  (¶¶ 149-150). It contends that the misrepresentations by Sandestin and others evidenced reckless indifference to the rights of others, tantamount to an intentional violation of those rights.  (¶151).

Defendant Sandestin claims that there is no evidence to support plaintiffs' allegations against it, and it is entitled to summary judgment.  It also claims that

K&H's compensatory damages claim is not viable as this claim has been more than fully satisfied by the foreclosure sale, where the K&H property was sold for several hundred thousand dollars more than the maximum appraised value K&H itself placed on the property.  Because there are no compensatory damages, it argues, K&H's punitive damages claim must fail.  Alternatively, the claims are moot and must be dismissed for lack of subject matter jurisdiction.  Finally, Sandestin asserts that there are no allegations against it in the supplement pleading in which Bla-lock was joined as a party plaintiff, and that the fact that Bla-lock, which was not created until well after the occurrence of the malfeasance alleged in the complaint, acquired title to the property at issue does not bestow it with rights or standing to pursue a claim on behalf of its predecessor in interest.  Therefore, argues Sandestin, any claims against it by Bla-Lock should be dismissed.  (Doc. 385, ¶¶ 3, 4, 5, 9, 10, 11, 13).

<u>Summary Judgment Standard</u>

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); see also *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might

affect the outcome of the case under the governing law. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. See *id.*; see also *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity and Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. See *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000); *Ramsey v. Leath*, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999). The court is not obliged to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50, 106 S.Ct. at 2511. And, it is improper for the district court to make credibility determinations, such as between contradictory affidavits, on a motion for summary judgment. *Miller v. Harget,* 458 F.3d 1251, 1256 (11th Cir. 2006); *Bischoff v. Osceola County,* 222 F.3d 874, 876 (11th Cir. 2000); *Harris v. Ostrout*, 65 F.3d 912, 916-17 (11th Cir. 1995); *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). This is because at the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. See *Anderson*, 477 U.S. 249. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ( "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are

jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.")

   **Plaintiff's § 1983 claims**

   "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. " *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55, 101 L.Ed.2d 40 (1988) (citations omitted); see also *Holmes v. Crosby*, 418 F.3d 1256 (11th Cir. 2005) (citing *West*). In *Adickes v. S.H. Kress & Co.*, the Supreme Court noted that a private party who is involved in a conspiracy with, i.e. is a willful participant in joint activity with, a state actor is acting "under color of law" for purposes of § 1983. *Adickes*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605-1606, 26 L.Ed.2d 142 (1970).   A plaintiff attempting to prove such a conspiracy must show that the parties "reached an understanding" to deny the plaintiff his or her rights. *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990) (citing *Addickes,* 398 U.S. at 152, 90 S.Ct. at 1605).   The allegedly conspiratorial acts must impinge upon the plaintiff's federal right, and the plaintiff must prove an "actionable wrong" to support the conspiracy. *Bendiburg*, 909 F.2d at 468 (citations omitted).   Nevertheless, the Eleventh Circuit has further explained a private party should only be viewed as a state actor for § 1983 purposes in rare circumstances. *Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001); *Wilson v. Dollar-Thrifty Auto Group South Fla.*, 286 Fed.Appx. 640 (2008).[8]   To hold that private parties are state actors, the court must conclude that one of the following three conditions is met:

      (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private parties performed a public function that was traditionally the

   _____

      [8]The undersigned cites *Wilson* only as persuasive authority and recognizes that the opinion is not considered binding precedent.  *See* 11th Cir. R. 36-2.

*Case No: 3:06cv494/MD*

exclusive prerogative of the State ("public function test"); or (3) "the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise[ ]" ("nexus/joint action test").

*Rayburn,* 241 F.3d at 1347 (alterations in original) (citation omitted); *Wilson v. Dollar-Thrifty Auto Group South Fla.*, supra; see also *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961) (originating the nexus/ joint action test).

K&H's claim for liability in counts II and III is based on the nexus/ joint action test. To sustain a claim under this test, the symbiotic relationship between the entities must involve the alleged constitutional violation. *Patrick v. Floyd Medical Center*, 201 F.3d 1313, 1316 (11th Cir. 2000) (See *National Broadcasting Co. v. Communications Workers*, 860 F.2d 1022, 1027 (11th Cir. 1988) (citing *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 547 n. 29, 107 S.Ct. 2971, 2986 n. 29, 97 L.Ed.2d 427 (1987)). Each case is analyzed on its own facts to determine whether the interdependence between the private and state entities reflects sufficient state involvement to provide the basis for a § 1983 claim. *Focus on the Family v. Pinellas Suncoast Transit,* 344 F.3d 1263, 1277 (11th Cir. 2003); *Patrick v. Floyd Medical Center*, 210 F.3d at 1315 (citing *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 726, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961)); *Willis v. University Health Services, Inc.*, 993 F.2d 837, 840 (11th Cir.1993) (examining relationship between private and public entities and finding insufficient symbiotic relationship to state a § 1983 claim). The fact that a state entity may be liable for a private entity's acts under an agency theory does not automatically transform the private entity's action into state action. *Patrick v. Floyd Medical*, 201 F.3d at 1316-1317 (noting that respondeat superior protects state agency from suit for injury inflicted solely by its agent).

Sandestin contends that the uncontroverted testimony and evidence of record is that no one representing, or on behalf of Sandestin has had any involvement with

Walton County concerning the property rights alleged to have been infringed. Sandestin contends that "[e]very witness identified by K&H or the County as having been involved with any aspect of K&H's property or with development rights on that property has either identified no participation by or contact with the SOA, or has affirmatively denied participation by the SOA."  (Doc. 385 at 10).

Sandestin further asserts that it is a Florida non-profit corporation that operates wholly independently from Walton County.  It also claims that K&H has not shown that any agreement exists under which the County has any responsibility for or control over Sandestin, its property or facilities (or vice versa) and that K&H has not shown that there is an agreement by which Sandestin and the County agreed to indemnify one another, or that SOA leases the property at issue or any property from the county or any other facts sufficient to sustain a 1983 claim against it in the capacity of "state actor."

In response, plaintiff states that there is "certainly enough ambiguity about the relationship that it is a proper issue for a jury to decide."  (Doc. 408 at 11).  K&H seemingly attempts to obfuscate the issue by lumping Sandestin into its repeated references to "the Defendants" without pointing to any specific action taken by this particular defendant.

The facts as set forth in the parties' statement of facts support Sandestin's position that there is insufficient proof of a symbiotic relationship between it and the County to support the § 1983 claims.  The only act specifically attributable to defendant SOA was that it disapproved and removed a sign K&H had placed on its property.  (Doc. 409 at 13-15).  Robert Deane, a real estate sales broker and Vice President of Commercial Properties for Legendary Realty, Inc., was given permission by K&H to sell the K&H property.  (Doc. 218-11/ Deane deposition, p. 4, l. 15-25).  Mr. Deane had permission from Roger Murray to put a sign on the property to help facilitate the sale.  (*Id.* at 14).  After placement of the sign, Deane was informed by Sandestin that the sign did not "meet guidelines" and "needed to be submitted."  (*Id.*

at 15).  Deane did not remove the sign himself, but submitted a picture of it to Sandestin.  The sign was disapproved and removed.  (*Id.* at 15-16, 21).  Deane believed that the sign should have been permitted under the Sandestin Architectural guidelines.  (*Id.* at 19, 21).  He indicated that at some point he received correspondence from Vance Askew, an employee of Intrawest who also sat on the SOA Board.  Askew stated that after subsequent review, it appeared that the reason the sign was taken down, that it was put up without project approval and thus did not comply with the guidelines, was not supported by the guidelines, and that the guidelines were going to be modified in such a way that the sign still would not be acceptable.[9]  (*Id.* at 21, 26).  The letter further explained how Murray could erect a temporary sign, and the proper steps in which to do so.  (*Id.* at 22).  Deane stated that he did not appeal the S.O.A.'s decision and he was unaware of whether Murray did.  (*Id.* at 27).

Sandestin's guidelines concerning signage are as follows:

PRIOR SANDESTIN GUIDELINES

6.     Temporary identification signs announcing new development within the community will be permitted.  Such signs must meet the attached specifications and have prior review and approval of the S.O.A. Architectural Review Board. (Please refer to Addendum C, Sign Specifications.)

(doc. 219-6/Exhibit 165 at 4).

AMENDED SANDESTIN GUIDELINES

6.     Temporary identification signs announcing new development within the community will be permitted only after such new development or development project has been approved by the S.O.A. A.R.B.  Such

_____

[9]Defendant Howard explained the difference between certain acceptable and unacceptable signs in his deposition.  He stated that if a real estate project has been approved through Sandestin and has development rights, signs can be posted announcing that development or noting that there is property "for lease" within the development.  (Doc. 235/3 K. Howard Deposition, p. 91). "For sale" signs, on the other hand, are prohibited.  (*Id.*)  Because the development rights to the K&H property were in dispute, no signage relating to new development would be permitted on the property.

> signs must meet the attached specifications and have prior review and
> approval of the S.O.A. Architectural Review Board. (Please refer to
> Addendum C, Sign specifications.)

**(Doc. 182-8/Exhibit 45 at 8)**

K&H argues that the changes to the guidelines support the existence of a conspiracy
"because Defendant Howard and the Defendant SOA knew that K&H would never get
development approval to allow the placement of a sign because they had conspired
with Defendants Walton County, Howard, and Intrawest to steal the development
rights vested in the K&H property." (Doc. 209 at 15). Roger Murray threatened legal
action as far back as 2001 because he did not agree with the position the A.R.B. had
taken on signage. (Doc. 216/6, exh. 49 at 13). The court does not concur that the
guidelines changes provide evidence that supports a conspiracy.

SOA propounded interrogatories to K&H asking it to identify the specific acts
or failures to act on the part of the SOA that were allegedly conducted jointly with
WALTON COUNTY officials or other Defendants and which K&H contends made the
SOA a state actor for purposes of K&H's due process and equal protection claims.
K&H answered as follows:

> A) "Mr. Stange testified at the November 4, 2002 Land Use Hearing
> before the Board of County Commissioners that the Howard project and
> the 2002 NOPC was 'a good project and will bring good quality of life
> to Walton County.'"; and

> B) "In addition, Defendant Sandestin was created in the Sandestin
> Declaration of Covenants, Conditions & Restrictions and recorded in
> OR Book 203 and Page 58, attached to the Amended Complaint as
> Exhibit 1, to oversee common area issues in Sandestin. The Intrawest
> Defendants control and sit on Sandestin Defendant's Board of Directors
> and are integral participants and allies in the decision making
> processes of Sandestin. Intrawest prepared and submitted the NOPC
> for the benefit of the Howard Defendants and to damage the Plaintiff.
> The Defendant Sandestin was a willing and active participant in the
> planning and execution of the Howard Defendants' plan to take the
> Plaintiff's Property. Specifically, Mike Stange has known for years of

the Howard Defendants' attempts to prevent the development and/or sale of Plaintiff's Property."; and

C) "Mr. Stange informed me that the Sandestin Defendants had an agreement with the Howard Defendants to manage the two new hotels the Howard Defendants were building, and I assumed this was to include the use of Sandestin amenities. As a result, Sandestin assisted the Howard Defendants in their attempts to prevent me from either selling or developing my property to anyone other than the Howard Defendants."

(K&H's Answers to Sandestin's Interrogatories 4-11-07 #1, #2).  Roger Murray, Jr., President of K&H, confirmed the accuracy and comprehensiveness of these assertions at the time they were made.  (Doc . 182/22- Murray deposition, p. 96, l. 12-25).

Mike Stange, current Senior Vice President of Intrawest Hospitality Management, in 2000 and 2001 was Vice President and General Manager of Sandestin Golf & Beach Resort and was in each position an employee of defendant Intrawest. (Doc. 182/25-Stange Deposition at 7,8).  Stange testified at his deposition, that to the extent he had made any comments or testified at the November 4, 2002 land use hearing before the Board of County Commissioners about the 2002 NOPC, he was at that hearing as a "cheerleader" on behalf of Intrawest, not the SOA.  (Doc. 182/25-Stange Deposition at 33).  Keith Arsenault, SOA's executive director, testified that the SOA does not participate in public hearings associated with Notices of Proposed Change to the DRI, and it does not have any input on density or intensity issues[10] in commercial properties within the DRI.  (Doc. 182/3-Arsenault deposition at 34-35).  Roger Murray himself acknowledged that Stange's knowledge and actions with respect to Howard defendants' alleged attempts to prevent the development and/or sale of his property or refused to correct alleged wrongs with respect to the

_____

[10]According to the verified amended complaint, commercial development rights are usually measure in square feet of allowable development and are referred to as "intensity," while residential development is referred to as "density." (Doc. 49, ¶ 19).

density and intensity of the parcel had nothing to do with defendant Sandestin. (Doc. 182/22-Murray video deposition at 110- 111).  Vance Askew also testified that although he was the Vice-President of Development for Intrawest and the head of the Sandestin Owners Association Architectural Review Board that he "wore two different hats," keeping his roles separate and distinct.  (Doc. 182/4-Askew deposition at 55).  Even Roger Murray acknowledged that he was not claiming that actions taken by Intrawest employees who happened to serve on the SOA Board were actions of the SOA.  (Doc. 182/22-Murray deposition at 99).  Finally, K&H is not aware of any officer or director of the SOA, other than Intrawest employees serving on the Board, making any representation to anyone concerning the issue of density/intensity on the K&H property.   (Doc. 182/20-K&H's Answers to SOA's Interrogatories 4/11/07 #4).

SOA was not a participant in the NOPC process or in the planning or execution of the alleged plan by the Howard defendants to take K&H's property. (Doc. 182-25/-Stange deposition at 35; 182-22/-Murray deposition at 110-111; 182-2/-Arsenault affidavit).  No relationship has been proven between the SOA and the Howard Group other than Sandestin's imposition and collection of homeowners association assessments. (Doc. 182-25/- Stange deposition at 35; doc. 182-3/-Arsenault deposition at 28).  There is no record evidence that there has been involvement, contact, or communication between Sandestin and Walton County concerning any issue, including the question of density or intensity on the K&H land. (See Doc. 182-23/- Pat Blackshear deposition at 3-4; doc. 182-26/- Tom Blackshear deposition at 3; doc. 182-5/-Bradley deposition at 3-4; doc. 182-21/- Miller deposition at 5; doc. 182-27/- Ward deposition at 3; doc. 182-28/- Williams deposition at 3).

Therefore, based on the foregoing, the court finds that K&H has failed to prove a symbiotic relationship between SOA and Walton County that would provide the basis for a finding that SOA acted as a "state actor" and would support a claim under § 1983.  K&H's claim for liability in counts II and III is based on the nexus/ joint

action test.  To sustain a claim under this test, the symbiotic relationship between the entities must involve the alleged constitutional violation.  *Patrick v. Floyd Medical Center*, 201 F.3d 1313, 1316 (11th Cir. 2000) (See *National Broadcasting Co. v. Communications Workers*, 860 F.2d 1022, 1027 (11th Cir. 1988) (citing *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 547 n. 29, 107 S.Ct. 2971, 2986 n. 29, 97 L.Ed.2d 427 (1987)).  Each case is analyzed on its own facts to determine whether the interdependence between the private and state entities reflects sufficient state involvement to provide the basis for a § 1983 claim.  *Focus on the Family v. Pinellas Suncoast Transit, supra*; *Patrick v. Floyd Medical Center*, supra.  Sandestin Owners Association is entitled to summary judgment on Counts II and III of plaintiff's verified amended complaint.

### Supplemental Jurisdiction over Fraudulent Misrepresentation Claim

In Count VI of the verified amended complaint, K&H asserts a state law claim for fraudulent misrepresentation pursuant to the court's supplemental jurisdiction under 28 U.S.C. § 1367.  It is well-established that once a plaintiff's federal claims are dismissed, there remains no independent federal jurisdiction to support the court's exercise of supplemental jurisdiction over the state claims against defendants.  See *Baggett v. First National Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir. 1997).  Title 28 U.S.C. § 1367(c)(3) provides that the district court may decline to exercise supplemental jurisdiction over claims after it has dismissed all claims over which it has original jurisdiction.  See also *United Mine Workers v. Gibbs,* 383 U.S. 715, 725-26, 86 S.Ct. 1130, 1138-39, 16 L.Ed.2d 218 (1966).  Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction. *Baggett*, 117 F.3d at 1353 (citing *Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1569 (11th Cir. 1994); *Executive Software N. Am. v. United States Dist. Court*, 15 F.3d 1484, 1493 (9th Cir. 1994); *New England Co. v. Bank of Gwinnett County*, 891 F.Supp. 1569,

1578 (N.D.Ga.1995); *Fallin v. Mindis Metals, Inc.*, 865 F.Supp. 834, 841 (N.D.Ga.1994));
see also *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002).  "Both
comity and economy are served when issues of state law are resolved by state
courts."  *Rowe*, 279 F.3d at 1288.  The argument for dismissing the state law claims
in order to allow state courts to resolve issues of state law is even stronger in a
situation such as this when the federal claims have been dismissed prior to trial.  *Id.*
While it would be convenient for the plaintiffs to continue litigating this case in their
chosen forum, the discretion on whether to exercise supplemental jurisdiction is
vested in the sound discretion of the district court.  *Rowe*, 279 F.3d at 1288.  The
court is not inclined to exercise its jurisdiction under the circumstances of this case,
as doing so would require this court to address not only substantive state law, but
a statute of limitations issue not squarely addressed by the plaintiffs' response.
Therefore, Count VI of the complaint will be dismissed as to this defendant.

An appropriate Order will be entered in accordance with the foregoing
memorandum opinion.

At Pensacola, Florida this 27th day of March, 2009.

/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**